UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LOYCE HENDERSON,

    Plaintiff,

v.                                                     Case No. : 8:10-cv-_____-T-_____

ERIC SHINSECKI, SECRETARY,
U.S. DEPARTMENT OF VETERANS AFFAIRS,

    Defendant.
_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW the Plaintiff, LOYCE HENDERSON, by and through her undersigned counsel, and brings this action for damages and injunctive relief against the Defendant, ERIC SHINSECKI, as Secretary of the U.S. DEPARTMENT OF VETERANS AFFAIRS, and alleges as follows:

**JURISDICTION**

1.    This is an action for damages and other relief brought pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 633a, as amended, and Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1977a, for intentional discrimination on the based of age and sex pursuant to 42 U.S.C. § 2000e. Plaintiff also asserts claims under the Rehabilitation Act, 29 U.S.C. § 701et.seq., for discrimination based on disability. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343; 42 U.S.C. § 2000e.

## PARTIES AND VENUE

2. Plaintiff is a female person, over the age of forty, and suffers from Meniere's disease, residing within the area of the United States District Court for the Middle District in Pasco County, Florida. She is employed by Defendant in Tampa, Hillsborough County, where Defendant maintains the James A. Haley Medical Center (hereinafter "the Hospital").

3. Defendant is the "Agency Head" of the United States Department of Veterans Affairs, an agency of the Executive Branch of the Government of the United States. Defendant maintains facilities within the state of Florida, and in the Middle District of Florida, and in this Division, including the Hospital in Tampa, Florida, as well as other locations in the Hillsborough and Pinellas County areas.

4. The claims asserted in this Complaint arose in the above-described District and Division, in the Hillsborough County area at the Hospital in Tampa, Florida.

## GENERAL ALLEGATIONS

5. Plaintiff has been employed by the Defendant at the Hospital for a number of years. At the time of the events complained of she was employed as a GS-11/3 Administrative Officer (AO) in the Spinal Cord Injury Unit (SCI). She had held that position for 4 years 10 months under John L. Merritt, M.D., Chief, SCI, and had received Highly Successful performance ratings each of those years. She was assigned as the Administrative Coordinator by Dr. Merritt to the project manager, Mike Tixier, during three years (2005-2008) of construction on the new SCI Long-Term (F Wing) addition being built in the SCI

Center. Dr. Merritt had promised Plaintiff that he would put her in for $5,000.00 Special Contribution Award when the F Wing was completed. Her duties as Administrative Coordinator were extensive and covered three years. The Administrative Coordinator duties were in addition to her daily Administrative Officer duties. In April of 2008, Dr. Cutolo, Chief of Staff, became aware of serious problems involving Dr. Merritt's performance and issues involving patient care. The plaintiff had been involved in the channeling of the complaints and patient care issues to the Chief of Staff. As a result of a hospital investigation into the various reports, Dr. Merritt was removed as the Chief of SCI, and demoted to staff physician, but through negotiations he retained the GS-15/10 grade and salary he had received as Chief.

    6.    Dr. Merritt was replaced as Chief by Dr. Robert Shapiro, DDS, a dentist, not a physician who is board certified in Spinal Cord Medicine. The requirements are dictated by the 1176.1 Spinal Cord Handbook and overseen by Central Office based in Seattle, Washington, that provides guidance for all SCI Centers within the VA Healthcare System. Dr. Shapiro was made Acting Chief, SCI and became Plaintiff's immediate supervisor on May 2, 2008. On first meeting Dr. Shapiro, Plaintiff was very optimistic that positive changes would be made in SCI, but within a few days became aware of his subtle hostility towards her, which she felt was due to her lack of a higher education, age, sex, and disability. Immediately after assuming the Acting Chief position, Dr. Shapiro made statements to Plantiff regarding the upgrading of the AO position to a GS-13 and that the upgrade was a priority to him, but felt that in order for the position to be upgraded

it should be mandatory that the incumbent hold a Masters degree.  Plaintiff informed Dr. Shapiro that she did not have a degree and due to her age would not go back to college.  He told her he already knew this as he was told by Dr. Merritt in a prior meeting that she did not hold a degree, but that they both agreed that the position needed to be upgraded.  She felt that his statements concerning the lack of education would mean replacing her

7. Both Dr. Merritt, Dr. Shapiro and Dr.Cutolo were aware that she suffered from Meniere's disease, that it was aggravated by stress, and that in extreme cases, or where she had a "spell" it affected her hearing, memory, concentration, vision and made her dizzy or almost blackout so she missed work on occasion.  They were also aware that she used hearing aids on a daily basis

8. On several occasions, during staff meeting, a few days after she had an "episode", or had to go home, Dr. Merritt would stop her in the middle of staff meetings and say "I need for you to repeat  word for word what I just said", in a condescending manner, this happening in front of staff physicians and the employees that Plaintiff supervised.  These requests embarrassed and humiliated Plaintiff, which aggravated the Meniere's disease causing more stress.

9. Dr. Shapiro began almost immediately to belittle her, assign her menial tasks or tasks which she had no previous experience such as the Pay Panel Actions, and took away some of her more significant responsibilities particularly involving those as the Administrative Coordinator for the new F wing. He brought in an intern David Phillips, from the Directors' office that he had been assigned to mentor, and although that person (early 20's, male, working on his Masters degree, no disability) was working as an intern and ineligible to be hired into her position, Dr. Shapiro plainly intended to and ultimately did place Mr. Phillips into the Administrative Officers position before he finished his internship and received his degree in Health Administration.

10. Sometime in June, 2008, during the weekly staff meeting, Dr. Shapiro introduced David Phillips to the SCI staff and informed everyone that Mr. Phillips would have an office on the F Wing and would assume all F Wing responsibilities previously handled by Plaintiff, and that all questions and concerns relating to that project should be directed to him, rather than the Plaintiff. Plaintiff was not told of these changes prior to the staff meeting and was clearly astounded at the news. Rumors began to spread, and as a result, people would frequently come up and ask her when she was leaving, where she was going, etc.

11. In connection with the building of the new F Wing, an open house was planned, which would commemorate the official opening of the F Wing. Plaintiff was told by Dr. Shapiro two days before the open house that David Phillips was to be out of town and she needed to coordinate the "feminine" details for the open house, such as

procuring funds for and ordering the cakes, refreshments, flowers, arrangement of tables, etc. Plaintiff spoke to Mr. Phillips the same day and ask why he was going to be out of town to which he stated that that trip had been canceled days before and that he would be present for the open house.  When Plaintiff relayed this information to Dr. Shapiro, he stated that Mr. Phillips had more important duties to attend to.  Plaintiff was not invited or mentioned during the opening ceremony, but David Phillips was present.  Plaintiff asked Dr. Shapiro about the Special Contribution Award that was promised to her by Dr. Merritt for her dedication and hard work on the F Wing, to which Dr. Shapiro stated that the F Wing had been given to David Phillips and he saw no reason to put her in for an award.

     12. Shapiro began to hound her daily about looking for a new position. Shapiro would make periodic remarks disparaging females in general and their ability to handle positions of high stress, to include a certain female physician. He made a statement in the early morning staff meeting, which was conducted in Plaintiff's office, that Dr. Coffey, female neurologist, would be put on the F-Wing "where she could do no harm". Several times after these early morning administrative meetings, when asked how his son was doing, he would make comments about his ex-wife not wanting to work, women needing to have children to get child support and so forth, reflecting an anti-female bias. After the others had left the office, he would make comments to Plaintiff stating that the AO position needed to be upgraded to a GS-13, but in order for that to happen the person needed to have a Masters degree.  He would state that the Directors office was looking for

6

a position for David Phillips when he finished his internship and received his Masters degree. In July Dr. Shapiro directed Plaintiff to give David Phillips access to all of the SCI folders she worked with and to also make sure he had the edit option. Many of those folders were used by the Administrative Officer for storing information such as workload spreadsheets, clinic set-up, calendars, and reports for various subjects, and performance evaluations for the staff that she supervised.

  13. At one point Dr. Shapiro presented the Plaintiff with a "Fact Finding Investigation". Each of the "Facts" that were to be investigated were completely unfounded and in normal circumstances would never have been investigated as they could be explained in one or two sentences. Dr. Shapiro asked her to answer the investigation with a rebuttal and said he would meet with her the following week to discuss the investigation and his decisions concerning the actions he would take at that time. Plaintiff completed her rebuttal the same day and hand delivered it to Dr. Shapiro. She then contacted the Union for guidance and although they could not represent her as she was a non-bargaining employee, they advised her to bring a witness to the meeting. She contacted Dr. Shapiro by e-mail and asked when the meeting was to take place as she needed to give her witness a couple days notice. The meeting was at first put off by Dr. Shapiro for various reasons and then he started stating that if Plaintiff would take another position it would be "forgotten". Plaintiff was not concerned about the Fact Finding Investigation as she had done nothing wrong, but knew Dr. Shapiro was trying to use it as leverage against her in order for her to take another position. Several times he stated to

Plaintiff that he would "help" her obtain another position. He would call her into his office to tell her he received complaints from staff concerning the way she handled a situation, he felt she was too direct, but would never allow her to explain herself or her take on the situation and why she handled it the way she did. He said he had reports of contact, but would never show them to her or allow her to address the report of contact. He regularly told her that if she took another position that the investigation would "go away" and frequently assert that she should be looking for another position and whether she was willing to take what was available if a position could be "made" for her.

      14.    Dr. Shapiro, Acting Chief, SCI, Dr. Jorge, Associate Director, Shella Miller, Chief, Health Administrative Service and Neal Hamilton, Chief, Human Resources, met to discuss the "employee in SCI", with the intent of removing Plaintiff from SCI and placing her in Health Administration Service under Shella Miller. Nothing came of that meeting. Another meeting with Dr. Shapiro, Dr. Jorge, Neal Hamilton and Jim Barnes, Chief, Prosthetics, occurred the end of July concerning a position in Prosthetics, which did become available.

      15.    When Plaintiff received the Fact Finding Investigation she called the EEO office and spoke to Michael, an EEO Specialist. She made an appointment to go in and see him, which she did, taking the Fact Finding Investigation for his review. She was very upset and crying at that time. Michael gave her the paperwork to fill out to file an EEO, but told her to hold off handing it back in as he was meeting with Dr. Jorge that day and would discuss the matter with him and get back with her no later than the next day.

She could then decide if she needed to file an EEO. He never called Plaintiff back. She finally was able to meet with Sylvia Jordan, another EEO Specialist. After going over all the events that she went over with Michael, Sylvia told her she had no case and that she should take the first job that was offered to her.

16. The harassment continued on a daily basis. Constant comments about the Fact Finding Investigation, reports of contact that she was never shown, assignments that she had never done before (his job), but which she completed with the help of the secretaries in the Chief of Staff and Director''s office was a daily occurrence from Dr. Shapiro. If he gave her a project she was unfamiliar with and ask him for direction, he would say that she, at her level, should know the proper way to complete the project. Again, she would seek guidance from the staff in the Chief of Staff's office.

17. His comments became severe and pervasive, with him standing in Plaintiff's doorway telling her everything would be squashed if she would take another position. Depression and Anxiety were starting to affect Plaintiff. She was prescribed anti-depressants and anxiety medication from her doctor, migraine medication from her neurologist and had made an appointment with a mental health specialist due to thoughts of suicide. Her husband was a GS-5 at the time and she, being a GS-11, earned a larger salary, which paid the majority of the bills. She felt that if she lost her job from no fault of her own, they could lose the things they worked so hard for and she was severely depressed and anxious.

18. She told Dr. Shapiro that did not know why he was trying to force her out of her position, that she knew her duties and did an excellent job as AO, but his constant harassment was making her depressed and anxious, which was affecting the Meniere's disease and her marriage. That her husband was a GS-5, and they needed her salary to live in the high economy. He told her she was depressed because of the stress of the job, and felt the position was overwhelming to her and she needed a less stressful position. She replied that the position itself was not stressful, but his harassment was. He again told her of the position in Prosthetics and that she needed to contact Neal Hamilton. Plaintiff and her husband were going on leave the following week, so she contacted Neal Hamilton to set up a meeting.

19. Around August 8, Plaintiff met with Neal Hamilton, Chief, Human Resources. Mr. Hamilton showed her to a seat at a table in his office and at the place was a folder with her name on it. She opened the folder and on top was a letter of Intent to Discipline. One of the statements in the form stated that she was to be suspended for three days due to dereliction of duties. She asked Mr. Hamilton what the letter was for and he asked her if Dr. Shapiro had spoke to her concerning the intent to suspend, to which she replied "no". He then snatched the folder from her hand and said there was no reason for her to read the letter. He went on to print out the position description of the Program Support Specialist that was open in Prosthetics for her to review. He told her that if she took the position the Fact Finding Investigation would be voided as if it never happened and the suspension would not be put into effect either. She told him the Fact

Finding Investigation was bogus and that the items that were to be investigated were unfounded, that she felt that she was being forced from her job due to going to Dr. Cutolo concerning Dr. Merritt's inability to manage SCI and the serious problems with patient care that were happening in SCI.  She told Mr. Hamilton that Dr. Shapiro had given several of her duties to David Phillips and then gave her assignments (Dr. Shapiro's duties) that she had no training in completing, but held her responsible for not knowing how to complete them.  She told him she was under the care of a physician and psychologist for depression and anxiety that the Meniere's disease she suffered from was out of control due to the stress that Dr. Shapiro was putting her under.

   20. The Program Support Specialist was only a GS-9, which meant that she would lose a large amount in yearly salary and because she was at the GS-11/3 grade. She would lose all future step increases as she would be a GS-9/10, the highest a person could go in the steps attached to a grade. Mr. Hamilton told Plaintiff that if she didn't take the position, the harassment would only continue and get worse.  Plaintiff wanted time to think this over during her time on annual leave, but Mr. Hamilton told her if she didn't take the position that day, the job would be posted and she would have to apply through the Open and Continuous board and she may not be selected after the interview. But, in taking the position she would have to sign an agreement to accept the downgrade to a GS-9/10.

   21. As a result she reluctantly "agreed" to request a transfer to the position in Prosthetics and take the downgrade to stop the harassment and avoid further stress, which

had aggravated her Meniere's disease, interfered with her ability to work, and caused her substantial emotional distress that was affecting her marriage.

22. The harassment, on an ongoing basis, the humiliation in front of other staff, her duties being stripped from her, which would eventually affect her performance evaluation, and the fact that she felt that she had nowhere to turn for help, began to affect her ability to do her job and to cause her serious concern that if she did not agree to the downgrade and transfer she would have a panic attack, which would cause further aggravation to her health and mental health condition. Eventually she felt that she had no choice but to take the downgrade to be free of Dr. Shapiro and his constant harassment.

23. Plaintiff stepped down and took the position in Prosthetics on August 8 effective August18. Monday, August 11, Mr. Phillips was moved from the F Wing into her position and office, even though as an intern and not finished with his Masters Degree program, he was not eligible to be hired by the Hospital until 140 days after his internship was completed. Since she was no longer in the AO position in SCI, she did not get the Special Contribution Award, she had been promised by Dr. Merritt when the new wing F-Wing was opened.

24. Plaintiff was going on leave that Friday, August 8 and would not return for a week. She left Mr. Hamilton's office at 4:15pm, and because she and her husband had reservations at an establishment some 3 hours away was not able to transfer many of her files from her hard drive to her H drive in the computer. She felt she would be able to do this when she returned.

25. When she returned from leave she learned from the Secretary, Anastasia Ohley and the Research Nurse, Theresa Schwartz that the lock on her office had been changed and that there was direct orders from Dr. Shapiro and David Phillips that she was not to enter the office. Also she learned that a computer technician had been in the office working on the computer for most of the day Monday, August 11. Some of the files Plaintiff did not get a chance to move were the journal entries she made on a daily basis, which she typed all information concerning her daily dealings with Dr. Shapiro and her thoughts.

26. One allegation that Dr. Shapiro has stated repeatedly was that Plaintiff gave him in writing a statement that she was overwhelmed in her duties and wanted to transfer to another service. The written statement has never been shown to Plaintiff or her counsel. Plaintiff feels that her personal journal of daily accounts was printed out by the computer technician and given to Dr. Shapiro, and that if there was an entry in her journal that pertained to being overwhelmed, it came from that journal, not anything she handed to Dr. Shapiro and was not pertaining to her job, but Dr. Shapiro's constant harassment.

27. In the past 5 years, Plaintiff had not received less than a Highly Successful evaluation, being exceptional in all her critical elements and received not only Special Contribution Awards, but also Performance Awards. Dr. Shapiro asked Dr. Merritt to complete the annual performance evaluation for Plaintiff, and as with the previous ones, she was rated Highly Successful. When Dr. Shapiro reviewed the performance evaluation, he changed the elements splitting up one and giving a lower rating to them,

which lowered Plaintiff's evaluation to Fully Successful, thus eliminating her performance award based on the 3.33 percentage given for Highly Successful evaluations.

28.     When Plaintiff filed a grievance against Dr. Shapiro concerning the lower evaluation and the fact that the dates and comments were not correct, and the fact that Dr. Shapiro had split one critical element into to two elements, Dr. Shapiro answered the grievance by removing the two critical elements he had wrongly split. Again that was originally one critical element that was a part of her performance evaluation. Those elements cannot be removed after the mid-term evaluation, which never took place. Dr. Merritt had every intention of giving Plaintiff a Highly Successful evaluation or comments for improvement would have been made during the mid-term evaluation, which never took place. The performance evaluation was not finalized until long after she was forced to transfer, and she did not get her annual performance evaluation award based on the GS-11/3 salary.

29.      All of the aforesaid acts were in furtherance of the pattern and practice of discrimination based on age, sex, disability.

30.     Plaintiff invoked EEO administrative procedures required pursuant to the provisions of the Civil Rights Act, proceeding to the filing of a formal complaint of discrimination which was assigned Agency Case No.: 2001-0673-200910144 through the Regional EEO Office in Saint Petersburg, Florida.

31. The case proceeded through the investigation and administrative stages, and eventually lead to a Final Agency Decision by Defendant. Plaintiff has exhausted all administrative preconditions and prerequisites to suit without resolution and Plaintiff elects to file this action in the District Court. This action is timely filed within the requirements of the Civil Rights Act and ADEA.

32. As a result of Plaintiff being forced to transfer from her position, the downgrading of her evaluations and the denial of the bonuses, which she has lost or will lose, her earnings, past and future, pension benefits and insurance benefits, including accrued sick leave and vacation time which she was required to expend, and suffers emotional distress, injury to her reputation and other compensatory damages as a result of the treatment by the Defendant.

33. In order to pursue her claims, Plaintiff has been forced to retain the undersigned counsel to prosecute these claims and to protect her rights, and is obligated to pay such counsel reasonable attorney fees.

WHEREFORE, Plaintiff LOYCE HENDERSON demands judgment from Defendant ERIC SHINSECKI, SECRETARY, DEPARTMENT OF VETERANS AFFAIRS as follows:

A. That Plaintiff be awarded consequential and compensatory damages and the costs of this action, including reasonable attorney fees, in accordance with 29 U.S.C. § 794a, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1977a;

B. Correction of her employment record, evaluations and so forth.

C. Such other and further relief as the Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands jury trial for all issues so triable.

Respectfully submitted,

*/s/ Frank E. Hamilton*

Frank E. Hamilton, III
Florida Bar No. 147112
unionlawyer3@frankhamiltonassociates.com
Frank Hamilton & Associates, P.A.
P.O. Box 10756
Tampa, FL 33679
Telephone: (813) 879-9842